UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JONESAFER L. BLANCH, JR.,

                 Petitioner,

Case Number 14-14085
v.                                           Honorable David M. Lawson

CATHLEEN STODDARD,

                 Respondent.

_____/

## OPINION AND ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS

A Wayne County, Michigan jury convicted state prisoner Jonesafer L. Blanch, Jr. of using a firearm to rob a Detroit bus driver. Blanch now challenges those robbery and firearm convictions and ensuing prison sentences in a *pro se* petition for a writ of habeas corpus. He contends that there was a breakdown in the relationship with his trial attorney, his trial and appellate attorneys were ineffective, and the prosecutor committed misconduct by arguing facts not in evidence. Warden Cathleen Stoddard responds that the petitioner did not preserve some of those claims for federal review and the state courts' decisions did not contravene federal constitutional law. The state court record demonstrates that the petitioner's claims do not warrant habeas relief. Therefore, the Court will deny the petition for writ of habeas corpus.

I.

The criminal information charged the petitioner with armed robbery, being a felon in possession of a firearm, and possessing a firearm during the commission of a felony.

Dwayne Bloodworth ("Bloodworth") was a bus driver for the City of Detroit Department of Transportation. At trial, he testified that about midnight on November 24, 2009, going into November 25, 2009, he stepped off his bus on Varjo Street to smoke a cigarette. The petitioner and

another young black man approached him and asked him a question. The petitioner was wearing a dark blue jacket with light blue sleeves.

Both young men walked away after making small talk, but they came back while Bloodworth was still smoking his cigarette outside the door of the bus. The petitioner then pulled out a gun, pointed the gun at Bloodworth, and said, "You know what time it is cuz." That meant to give up everything. Bloodworth responded by putting up his hands, but the petitioner told him to put his hands down, and he told the other young man to reach in Bloodworth's pockets. The other man complied and pulled out Bloodworth's wallet, which contained $425. The two men then walked away. They looked back and started running when Bloodworth activated a "call police" sign on his bus.

The police arrived within approximately five minutes. Bloodworth described the young men's clothing to the police and the black semi-automatic High Point gun that the petitioner had pointed at him. He also told the police that the petitioner was 18 to 22 years of age, 5'8" tall, and 175 pounds. At some point, he went to the police station and identified someone other than the petitioner and his accomplice in a group of pictures. He said he intentionally misidentified the suspects so that the young men who robbed him would get out of jail that night and he "could take justice in [his] own hands." At trial, he had no doubt that the petitioner was the man who robbed him and was wearing the blue coat with light blue sleeves on November 25, 2009.

Detroit police officer Howard W. Sweeney, III, testified that, about midnight on November 24, 2009, going into November 25, 2009, he and another officer were conducting an investigation at 7478 Varjo Street in Detroit. As a result of some information he received, he was dispatched to the corner of Van Dyke and Varjo Streets where he spoke with Bloodworth, the bus driver. He

acquired some information and descriptions from Bloodworth and then went westbound on Varjo Street to School Street and an alley where the suspects had fled. He entered the backyard at 7478 Varjo Street because there was an open privacy fence there, and he figured that the suspects might have doubled back there. He retrieved a loaded .45 caliber black High Point handgun from underneath the back porch at that address. The petitioner's mother subsequently admitted the officers at the front of the house. The petitioner and his co-defendant, Mark Taylor, were inside the house and taken into custody. In his police report, Officer Sweeney described the petitioner as a black male about twenty-two years old, 5'11" tall, 200 pounds, with black braided hair.

Sergeant Ryan Lovier of the Detroit Police Department testified that, on November 25, 2009, he and Sergeant Robert LaLone went to 7478 Varjo Street to search for evidence related to a robbery that had occurred earlier that morning. The officers received consent to search the home, and in one of the bedrooms, Lovier observed a dark blue jacket with light blue sleeves. The jacket matched the description of a jacket worn by the perpetrator of the armed robbery that occurred the previous night.

Sergeant Robert LaLone testified that he spoke with the petitioner in a detention area on November 25, 2009. After notifying the petitioner of his constitutional rights, he asked the petitioner about the robbery of the bus driver at Varjo and Van Dyke on November 25, 2009. The petitioner told him that someone named Nez had called him and Mark and asked them whether they wanted to get some money. They said, "Yeah," and Mark confirmed that he had a gun. Later, Nez arrived at the petitioner's house with "John John." The petitioner, Mark, Nez and John John got in Nez's car and went to Nevada Street. When a bus turned the corner and the driver got out of the bus, he and Mark approached the bus driver and asked the driver a question. Then they walked away, but Mark encouraged him to take the gun and "do it." He did not want to do it and told Mark to give

the gun to John John, who walked up to the bus driver with Mark. Mark then grabbed the gun from John John and took some things from the man. He met up with Mark and John John on School Street where Nez had parked. John John got in the car, and Mark handed the wallet to Nez. The petitioner and Mark ran to the petitioner's house at 7478 Varjo where Mark put the gun under the porch. The police arrived about fifteen minutes later.

The petitioner told Sergeant LaLone that he thought some money was taken from the bus driver, but that he had not wanted to be a part of the robbery. He claimed that he had merely stood at the Van Dyke bus stop or walked slowly down Van Dyke.

The parties stipulated that the petitioner had previously been convicted of a specified felony and was ineligible to use or possess a firearm on November 25, 2009. The petitioner did not testify or present any witnesses. His defense was that the victim's description of him did not fit him and that, at most, he was merely present at the time of the robbery.

The jury convicted the petitioner of all three charges. He was sentenced to prison terms of six to fifteen years for armed robbery, a concurrent term of one to five years for being a felon in possession of a firearm, and a consecutive term of five years for possessing a firearm during the commission of a felony, second offense.

On direct appeal, the petitioner argued that he was entitled to a new trial because there was a breakdown in the relationship with his trial attorney and because the trial judge did not conduct an adequate inquiry into the breakdown. The Michigan Court of Appeals found no merit in this claim and affirmed the petitioner's convictions. *People v. Blanch*, No. 300508 (Mich. Ct. App. Mar. 13, 2012). The state supreme court denied leave to appeal. *People v. Blanch*, 492 Mich. 857, 817 N.W.2d 69 (2012).

The petitioner raised the same claim in a motion for relief from judgment. His post-judgment motion also alleged that trial counsel was ineffective because he did not secure the presence of two witnesses, that the prosecutor violated his right to due process by arguing facts not in evidence, and that trial counsel was ineffective by not objecting to the prosecutor's comments. The petitioner also asserted that appellate counsel was ineffective by not raising all his claims on direct appeal. The trial court rejected the petitioner's claims because the claims lacked merit and because the petitioner previously raised, or could have raised, his claims on direct review. *People v. Blanch*, No. 09-031216-01-FC (Wayne Cty. Cir. Ct. July 2, 2013). On appeal from the trial court's decision, the petitioner raised only the issues about the prosecutor and the old claim about the breakdown in the relationship between the petitioner and his trial attorney. The Michigan Court of Appeals denied leave to appeal on the basis that the petitioner failed to meet the burden of establishing entitlement to relief under Michigan Court Rule 6.508(D), *People v. Blanch*, No. 319189 (Mich. Ct. App. Jan. 16, 2014), and the state supreme court denied leave to appeal for the same reason, *People v. Blanch*, 497 Mich. 867, 853 N.W.2d 366 (2014).

On October 22, 2014, the petitioner commenced this action, raising the claims that he presented to the state court on direct appeal and in his motion for relief from judgment. As noted above, Warden Stoddard contends in her response to the petition that two of the petitioner's claims are procedurally defaulted, meaning that he did not raise them properly in the state courts so as to preserve them for review on the merits by a federal court.

The "procedural default" argument is a reference to the rule that the petitioner did not raise all his claims on direct review, and the state trial court's denial of those claims on that basis is an adequate and independent ground for the denial of relief under state law, which is not reviewable

here. *Coleman v. Thompson*, 501 U.S. 722, 750 (1991). The Court finds it unnecessary to address this procedural question. It "is not a jurisdictional bar to review of the merits," *Howard v. Bouchard*, 405 F.3d 459, 476 (6th Cir. 2005), and "federal courts are not required to address a procedural-default issue before deciding against the petitioner on the merits," *Hudson v. Jones*, 351 F.3d 212, 215 (6th Cir. 2003) (citing *Lambrix v. Singletary*, 520 U.S. 518, 525 (1997)). The procedural default will not affect the outcome of this case, and it is more efficient to proceed directly to the merits.

## II.

The provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214 (Apr. 24, 1996), which govern this case, "circumscribe[d]" the standard of review federal courts must apply when considering an application for a writ of habeas corpus raising constitutional claims, including claims of ineffective assistance of counsel. *See Wiggins v. Smith*, 539 U.S. 510, 520 (2003). Because Blanch filed his petition after the AEDPA's effective date, its standard of review applies. Under that statute, if a claim was adjudicated on the merits in state court, a federal court may grant relief only if the state court's adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or if the adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1)-(2). "Clearly established Federal law for purposes of § 2254(d)(1) includes only the holdings, as opposed to the *dicta*, of [the Supreme] Court's decisions." *White v. Woodall*, --- U.S. ---, 134 S. Ct. 1697, 1702 (2014) (internal quotation marks and citations omitted). "As a condition for obtaining habeas corpus from a federal

court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011).

The distinction between mere error and an objectively unreasonable application of Supreme Court precedent creates a substantially higher threshold for obtaining relief than *de novo* review. The AEDPA thus imposes a highly deferential standard for evaluating state-court rulings, and demands that state-court decisions be "given the benefit of the doubt." *Renico v. Lett*, 559 U.S. 766, 773 (2010) (finding that the state court's rapid declaration of a mistrial on grounds of jury deadlock was not unreasonable even where "the jury only deliberated for four hours, its notes were arguably ambiguous, the trial judge's initial question to the foreperson was imprecise, and the judge neither asked for elaboration of the foreperson's answers nor took any other measures to confirm the foreperson's prediction that a unanimous verdict would not be reached" (internal quotation marks and citations omitted)); *see also Leonard v. Warden, Ohio State Penitentiary*, 846 F.3d 832, 841 (6th Cir. 2017); *Dewald v. Wriggelsworth*, 748 F.3d 295, 298-99 (6th Cir. 2014); *Bray v. Andrews*, 640 F.3d 731, 737-39 (6th Cir. 2011); *Phillips v. Bradshaw*, 607 F.3d 199, 205 (6th Cir. 2010); *Murphy v. Ohio*, 551 F.3d 485, 493-94 (6th Cir. 2009); *Rockwell v. Yukins*, 341 F.3d 507, 511 (6th Cir. 2003) (en banc). Moreover, habeas review is "limited to the record that was before the state court." *Cullen v. Pinholster*, 563 U.S. 170, 180 (2011).

## A.

The petitioner first argues that there was a breakdown in his relationship with his trial attorney and the trial court failed to conduct an adequate inquiry into the breakdown. The petitioner

asserts that he was not allowed to explain fully his concerns to the trial judge and the trial court placed docket concerns above those of fairness. The Michigan Court of Appeals adjudicated this claim on the merits and concluded that the petitioner had not shown good cause for substitution of counsel and the trial court's failure to appoint a substitute attorney was not an abuse of discretion. The court of appeals also found no merit in the petitioner's contention that the trial court placed docket concerns above fairness and did not conduct an adequate inquiry into the alleged breakdown.

The Sixth Amendment guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." U.S. Const. amend. VI. This constitutional right is applicable to the states through the Fourteenth Amendment, *Serra v. Mich. Dep't of Corrs.*, 4 F.3d 1348, 1351 (6th Cir. 1993) (citing *Gideon v. Wainwright*, 372 U.S. 335, 344–45 (1963)), and "implicit in this guarantee is the right to be represented by counsel of one's own choice." *Linton v. Perini*, 656 F.2d 207, 208 (6th Cir. 1981).

But "[t]he right to the assistance of counsel at trial does not guarantee that a criminal defendant will be represented by a particular attorney," whom he does not retain himself. *Serra*, 4 F.3d at 1351; *see also Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 624 (1989) ("Petitioner does not, nor could it defensibly do so, assert that impecunious defendants have a Sixth Amendment right to choose their counsel. The Amendment guarantees defendants in criminal cases the right to adequate representation, but those who do not have the means to hire their own lawyers have no cognizable complaint so long as they are adequately represented by attorneys appointed by the courts."). "[T]he right to counsel of choice does not extend to defendants who require counsel to be appointed for them." *United States v. Gonzalez-Lopez*, 548 U.S. 140, 151 (2006). And when, as in this case, "an accused seeks substitution of [appointed] counsel in mid-trial, he must show good

cause such as a conflict of interest, a complete breakdown in communication or an irreconcilable conflict with his attorney in order to warrant substitution." *Wilson v. Mintzes*, 761 F.2d 275, 280 (6th Cir. 1985).

It is true that "a trial court, acting in the name of calendar control, cannot arbitrarily and unreasonably interfere with a client's right to be represented by the attorney he has selected." *Linton*, 656 F.2d at 209. But a trial court has "wide latitude in balancing the right to counsel of choice against the needs of fairness and against the demands of its calendar." *Gonzalez-Lopez*, 548 U.S. at 152 (internal and end citations omitted); *see also United States v. White*, 451 F.2d 1225, 1226 (6th Cir. 1971) ("A motion for new court-appointed counsel based upon defendant's dissatisfaction with his counsel previously appointed is addressed to the sound discretion of the trial court.").

Factors that courts may consider when reviewing substitution motions include: "the timeliness of the motion; the adequacy of the [trial] court's inquiry into the defendant's complaint; and the asserted cause for that complaint, including the extent of the conflict or breakdown in communication between lawyer and client (and the client's own responsibility, if any, for that conflict)." *Martel v. Clair*, 565 U.S. 648, 663 (2012). When evaluating the extent of the conflict between the defendant and his attorney, a court may consider whether the conflict "was so great that it resulted in a total lack of communication preventing an adequate defense." *United States v. Mack*, 258 F.3d 548, 556 (6th Cir. 2001).

The petitioner's trial attorney was his second appointed attorney. Midway through trial, defense counsel informed the trial court that the petitioner wanted to testify and to explain some things. Defense counsel stated that he had advised the petitioner not to testify because he would not be able to withstand cross-examination. After explaining these things to the petitioner, the petitioner

had disagreed with him, called him a bad name, and banged on the door so hard that it almost came off the hinges.

The petitioner interrupted defense counsel at this point and said, "Tell her [the trial judge] what you told me. No, tell her the truth. Tell her what you told me." Defense counsel responded to the trial court by saying,

> Exactly, this is what I get all the time. This is all the time. I said to him that if he got on the stand and testified I should walk away, because I would not be doing justice to the system nor to him.
>
> . . .
>
> The bottom line, I'm having a very difficult time giving him a hundred percent because he won't, really won't let me. But just like he says right now, tell the truth. I'm telling you that . . . .

Trial Tr. at 61-62 (July 15, 2010).

The trial court acknowledged some "discontentment" between the petitioner and defense counsel and then reminded the petitioner of his right to remain silent. The petitioner interrupted the trial court and said, "I wish to remain silent." The trial court nevertheless went on to point out that the petitioner also had a right to testify and tell the jury his side of the story. After explaining these options to the petitioner, the court asked the petitioner what he wanted to do. *Id*. at 62-64. The discussion proceeded as follows:

> DEFENDANT BLANCH: I wish to remain silent.
> But I asked him a question and he told me, "Shut up. I'm the lawyer." I don't get to respond with him.
>
> [DEFENSE COUNSEL]: That is not accurate.
>
> DEFENDANT BLANCH: I got over eight people that can tell you. He came back there. I asked him a question. He walk[ed] off, don't say nothing. He just said, "Shut up. I'm the lawyer." That's exactly what he told me.

[DEFENSE COUNSEL]: I walk off because he yells at me. He shows me absolutely no respect. I'm a dumb . . . idiot. That's what he tells me. With all due respect, Judge —

DEFENDANT BLANCH: He told me that.

[DEFENSE COUNSEL]: No, you told me that, sir. With all due respect, Judge, I don't mind being the lawyer. I don't mind being called names. But after I go back there six or seven times and it's the same disrespect, I don't want to hear that. I'm sorry. I'm not an egg shell . . . . I can handle it, believe me. I'm an alligator skin. But after a while it's demeaning.

*Id*. at 64-65.

The trial judge then confirmed with defense counsel that he intended to rest after the prosecution presented three more witnesses, and the petitioner agreed with the trial court that it was an emotionally difficult time for him. The judge concluded that the petitioner and defense counsel were not so far apart as to require removal of defense counsel. The judge noted that the stress level was high, that they were in the middle of trial, and that it was important for everyone to maintain control. The court then stated that they would proceed and finish the trial that day. *Id*. at 65-67.

The Michigan Court of Appeals determined on direct review that the petitioner failed to show a breakdown in the attorney-client relationship. The court of appeals noted that, although initially there was a disagreement on whether the petitioner should testify, there was no irreconcilable dispute, there was no destruction of communication between the petitioner and defense counsel, and there was nothing in the record demonstrating inadequacy, lack of diligence, or disinterest on the part of defense counsel. The court of appeals disagreed with the petitioner's contention that the trial judge placed docket concerns above fairness, and the court of appeals stated that the trial court conducted an adequate inquiry into the alleged breakdown.

The record supports the state courts' findings and conclusions. There was an obvious conflict about whether the petitioner should testify, but the petitioner did not ask for substitution of counsel or complain about his attorney's competence. In fact, the petitioner twice informed the trial court during the court's colloquy with him that he wished to remain silent. That is an indication that the differences between the petitioner and counsel on matters of trial tactics were not so great that there was an irreconcilable conflict, a complete breakdown in communication, or an inability to prepare and present an adequate defense.

The state appellate court's conclusion that the trial court made an adequate inquiry and did not place docket concerns over fairness also is supported by the record. Although the trial judge did much of the talking after defense counsel explained his frustration with the petitioner, the court appears to have been trying to pacify the petitioner and to reason with him. The court gave the petitioner an opportunity to speak, and the petitioner took advantage of several opportunities to address the court.

There certainly was some friction between the petitioner and his (second) attorney, but the petitioner had no right to a meaningful relationship with his attorney. *Morris v. Slappy*, 461 U.S. 1, 13-14 (1983). Furthermore, the record indicates that the alleged breakdown in the relationship was largely the petitioner's fault. He apparently showed disrespect to his attorney on several occasions, called his attorney foul names, and violently pounded on a door while the attorney was attempting to communicate with him. "A disagreement between the defendant and defense counsel over legal strategy does not constitute good cause requiring substitution of counsel, nor does a defendant's unilateral decision not to cooperate with court appointed counsel." *Caldwell v. Phelps*, 945 F. Supp. 2d 520, 537 (D. Del. 2013) (citing *United States v. Goldberg*, 67 F.3d 1092, 1098-99

(3d Cir. 1995), and *United States v. Gibbs*, 190 F.3d 188, 207 n.10 (3d Cir. 1999)); *see also People v. Meyers*, 124 Mich. App. 148, 166-67, 335 N.W.2d 189, 197 (1983) (stating that "[a] defendant may not purposely break down the attorney-client relationship by refusing to cooperate with his assigned attorney and then argue that there is good cause for a substitution of counsel").

The state trial court did not violate the petitioner's limited right to counsel of choice by failing to appoint substitute counsel. Nor was the state appellate court's ruling — that the trial court did not abuse its discretion — contrary to or an unreasonable application of Supreme Court precedent. The Court therefore declines to grant the writ on the basis of the petitioner's claim.

### B.

The petitioner alleges next that his trial attorney was ineffective by not securing the presence of two critical defense witnesses. The petitioner raised this claim in his motion for relief from judgment, which the trial court denied on the merits and because the petitioner failed to raise his claim on direct appeal.

A violation of the Sixth Amendment right to effective assistance of counsel is established when an attorney's performance was deficient and the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). An attorney's performance is deficient if "counsel's representation fell below an objective standard of reasonableness." *Id*. at 688. The petitioner must show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id*. at 687. "Judicial scrutiny of counsel's performance must be highly deferential." *Id*. at 689. The Supreme Court has "declined to articulate specific guidelines for appropriate attorney conduct and instead [has] emphasized that the proper measure of attorney performance remains simply reasonableness under prevailing

professional norms." *Wiggins*, 539 U.S. at 521 (quoting *Strickland*, 466 U.S. at 688) (internal quotation marks omitted).

An attorney's deficient performance is prejudicial if "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687. The petitioner must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. Unless the petitioner demonstrates both deficient performance and prejudice, "it cannot be said that the conviction resulted from a breakdown in the adversary process that renders the result unreliable." *Id.* at 687.

Success on ineffective-assistance-of-counsel claims is relatively rare, because the standard for obtaining habeas corpus relief "is 'difficult to meet.'" *Woodall*, 134 S. Ct. at 1702 (quoting *Metrish v. Lancaster*, 569 U.S. 351, 358 (2013) (quoting *Richter*, 562 U.S. at 102)). The standard is "all the more difficult" on habeas corpus review because "[t]he standards created by *Strickland* and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so." *Richter*, 562 U.S. at 105 (citations and quotation marks omitted). "[T]he question is not whether counsel' actions were reasonable," but "whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard." *Ibid.*

The underlying basis for the petitioner's claim that defense counsel failed to secure the presence of two critical defense witnesses is defense counsel's comment at a pretrial hearing that he had two witnesses. Pretrial Tr. at 4 (Apr. 21, 2010.) At trial, defense counsel rested without presenting any witnesses. Trial Tr. at 97 (July 15, 2010).

"The failure to call favorable witnesses can amount to ineffective assistance where it results in prejudice to the defense," *Pillette v. Berghuis*, 408 F. App'x 873, 884 (6th Cir. 2010), but the Court "must presume that decisions of what evidence to present and whether to call or question witnesses are matters of trial strategy," *Cathron v. Jones*, 77 F. App'x 835, 841 (6th Cir. 2003) (citing *Hutchison v. Bell*, 303 F.3d 720, 749 (6th Cir. 2002)).  Here, the petitioner has not identified any specific witnesses that defense counsel could have produced, and he has not explained what the witnesses would have said if they had testified.  "Without producing or otherwise detailing the [potential] witnesses' testimony, the petitioner's claim essentially relies on 'speculation about what unidentified persons might have said,' and such a showing fails to carry [the petitioner's] burden to show prejudice."  *Veal v. Cooper*, 936 F. Supp. 511, 514-15 (N.D. Ill. 1996) (internal citation omitted); *see also Dell v. Straub*, 194 F. Supp. 2d 629, 650 (E.D. Mich. 2002) (concluding that defense counsel's failure to present witnesses did not amount to ineffective assistance of counsel because the petitioner failed to identify the witnesses, indicate their availability, or specify the content of their testimony).

The petitioner has failed to show that his attorney's performance was deficient and that he was prejudiced by defense counsel's failure to call witnesses.  Therefore, habeas relief is not warranted on the petitioner's claim of ineffective assistance of trial counsel.

## C.

The petitioner alleges that the prosecutor violated his right to due process by arguing facts during his opening statement that were not offered in evidence during the trial.  He also alleges that defense counsel was constitutionally ineffective by failing to object to the prosecutor's remarks.  The trial court rejected this claim because the petitioner failed to raise the claim on direct review and

because, even if the prosecutor's comments were erroneous, the petitioner had failed to show that the prosecutor acted in bad faith. The trial court also stated that counsel was not required to raise frivolous or meritless arguments.

"Claims of prosecutorial misconduct are reviewed deferentially" in a habeas case. *Millender v. Adams*, 376 F.3d 520, 528 (6th Cir. 2004). When the issue is the prosecutor's remarks, the "clearly established Federal law" is the Supreme Court's decision in *Darden v. Wainwright*, 477 U.S. 168 (1986). *Parker v. Matthews*, 567 U.S. 37, 45 (2012) (per curiam). In *Darden*, the Supreme Court stated that

> it "is not enough that the prosecutors' remarks were undesirable or even universally condemned." *Darden v. Wainwright*, 699 F.2d [1031, 1036 (11th Cir. 1983)]. The relevant question is whether the prosecutors' comments "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly v. DeChristoforo*, 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974). Moreover, the appropriate standard of review for such a claim on writ of habeas corpus is "the narrow one of due process, and not the broad exercise of supervisory power." *Id.*, at 642, 94 S.Ct., at 1871.

*Darden*, 477 U.S. at 181.

Although prosecutors may not "bring to the attention of the jury any 'purported facts that are not in evidence and are prejudicial,'" they may "'argue reasonable inferences from the evidence.'" *Byrd v. Collins*, 209 F.3d 486, 535 (6th Cir. 2000) (citations omitted). Further, "[i]n deciding whether prosecutorial misconduct mandates that habeas relief be granted, the Court must apply the harmless error standard." *Pritchett v. Pitcher*, 117 F.3d 959, 964 (6th Cir. 1997) (citing *Eberhardt v. Bordenkircher*, 605 F.2d 275 (6th Cir. 1979)). On habeas review, an error is harmless unless it had a "'substantial and injurious effect or influence in determining the jury's verdict.'" *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)).

In his opening statement, the state prosecutor represented that Bloodworth had described the armed man as being "a shorter man with braids wearing a dark blue overcoat with light blue sleeves." Trial Tr. at 27 (July 15, 2010). The prosecutor went on to say that, when Officer Sweeney went to the petitioner's house, "sure enough they find . . . Mr. Blanch, the short stocky fellow with braids." *Ibid.* The petitioner contends that witnesses did not describe the suspect in this way and, therefore, the prosecutor injected facts not in evidence. And it followed that defense counsel was ineffective for failing to object.

The opening statement, however, was "no more than an objective summary of evidence which the prosecutor reasonably expected to produce." *Frazier v. Cupp*, 394 U.S. 731, 736 (1969). Bloodworth, moreover, testified that the petitioner wore a dark blue jacket with light blue sleeves Trial Tr. at 34 (July 15, 2010), and he described the petitioner to the police as being 5'8" and 175 pounds, *id.* at 49-50. Officer Sweeney testified that, according to his police report, the petitioner had braided black hair and was 5'11" inches tall and 200 pounds. His report indicated that the other suspect was 6'0" tall and 185 pounds with short black hair. *Id.* at 79-81.

It is clear from the trial testimony that the petitioner was the shorter, heavier suspect and the one with braided hair. Because the prosecutor's opening statement was consistent with the evidence subsequently elicited from witnesses, his comments did not deprive the petitioner of a fair trial or due process of law.

Even if the prosecutor's remarks were improper, the trial court instructed the jurors that opening statements were not evidence. *Id.* at 18-19, 116. In light of this instruction, "there can be no reversible error because the remarks did not prejudice [the petitioner.]" *United States v. Wells*, 623 F.3d 332, 345 (6th Cir. 2010).

Finally, because the petitioner's claim about the prosecutor lacks merit, defense counsel was not ineffective by failing to object to the prosecutor's comments. "Omitting meritless arguments is neither professionally unreasonable nor prejudicial." *Coley v. Bagley*, 706 F.3d 741, 752 (6th Cir. 2013).

## D.

In his fourth and final claim, the petitioner contends that appellate counsel was constitutionally ineffective because counsel failed to raise claims about defense trial counsel's performance and the prosecutor's opening statement. To demonstrate that appellate counsel was ineffective, a habeas petitioner must (1) show that his attorney acted unreasonably in failing to discover and raise nonfrivolous issues on appeal and (2) demonstrate a reasonable probability that he would have prevailed on appeal if his appellate attorney had raised the issue. *Smith v. Robbins*, 528 U.S. 259, 285 (2000).

"[T]here is no constitutional right to have every nonfrivolous issue raised on appeal." *Workman v. Bell*, 178 F.3d 759, 771 (6th Cir. 1998) (citing *Jones v. Barnes*, 463 U.S. 745, 750-54, (1983)). Choosing which appellate issues to advance are tactical decisions "properly left to the sound professional judgment of counsel." *Ibid.* (citing *United States v. Perry*, 908 F.2d 56, 59 (6th Cir. 1990)). In fact, "[t]his process of 'winnowing out weaker arguments on appeal and focusing on' those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy." *Smith v. Murray*, 477 U.S. 527, 536 (1986) (quoting *Barnes*, 463 U.S. at 751–52).

Here, appellate counsel obviously winnowed out weaker arguments and focused on a single claim that he thought was more likely to succeed. This was effective appellate strategy because the

omitted claims lack merit for the reasons given above. "Appellate counsel cannot be found to be ineffective for 'failure to raise an issue that lacks merit.'" *Shaneberger v. Jones*, 615 F.3d 448, 452 (6th Cir. 2010) (quoting *Greer v. Mitchell*, 264 F.3d 663, 676 (6th Cir. 2001)).

Further, it is unlikely that the petitioner would have achieved success on direct appeal even if his claims about trial counsel and the prosecutor had been raised. Thus, appellate counsel's performance did not prejudice the petitioner. The petitioner is not entitled to relief on his claim about appellate counsel.

### III.

The state courts' decisions in this case were not contrary to federal law, an unreasonable application of federal law, or an unreasonable determination of the facts. The petitioner has not established that he is presently in custody in violation of the Constitution or laws of the United States.

Accordingly, it is **ORDERED** that the petition for a writ of habeas corpus is **DENIED.**

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated: January 16, 2018

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on January 16, 2018.

s/Susan Pinkowski
SUSAN PINKOWSKI